United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARK SAVIGNANO,

    Petitioner,

vs.

B. CURRY, Warden,

    Respondent.
_____/

No. C 07-1850 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner, a California prisoner currently incarcerated at the Correctional Training Facility in Soledad, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the 2006 decision by the Board of Parole Hearings ("Board") finding petitioner unsuitable for parole. For the reasons set forth below, the petition will be denied.

## BACKGROUND

The Board summarized the facts of the commitment offense as follows:

> On June 28, 1983, at approximately 3:00 a.m., the body of the victim, Terence Peden, was discovered on the 1000 block of 39th Avenue in Oakland, CA, by Rick Harris. Harris was riding his bicycle down San Leandro Boulevard when he noticed the victim's body lying in the street. Harris contacted the Oakland Police Department who upon arrival assessed that the victim showed no signs of life. Police officers also observed a large amount of blood on and about the body and what appeared to be stab wounds to the chest and neck areas of the victim. There was a bicycle lying on the sidewalk a few feet south of the victim. An autopsy revealed that the victim died of multiple stab wounds to the body, two of which were considered defensive type wounds. Investigation revealed that at about 2:00 a.m. on 6/27/83, a neighbor who lived in the 1000 block of 39th Avenue in Oakland, was awakened by the sound of his dog barking. He noticed the headlights of a car and looking out the window, saw a blue Ford with square taillights coming out of a U-turn. It was going very fast and the witness could not see how many occupants were in the Ford. Police put

> out an informational telephone number in the newspapers and Robert Souza responded.
>
> Souza informed police that on the evening of 6/27/83, at about 8:00 p.m. Mark Savignano arrived at his (Souza's) home. Also present were Mr. Souza's girlfriend and their child. Savignano and Mr. Souza's girlfriend had been drinking. The victim, Terence Peden, arrived at 10:00 p.m. A short time after Mr. Peden arrived, Savignano started getting loud. Mr. Souza was concerned because the child was trying to sleep. Mr. Peden turned to the defendant and asked Mr. Souza, "Who is this kid?" The defendant was evidently insulted by being referred to as a kid and put his hand on the handle of the sheath knife he was wearing. Mr. Souza saw the defendant give Peden a hostile stare, but nothing further happened at that point. At about 11:15 p.m., Mr. Souza asked the defendant and Peden to leave as he and his girlfriend wanted to go to bed. Mr. Peden had arrived on a bicycle. The defendant had arrived in a blue Ford with square taillights. Mr. Peden's bike was put in the trunk of Savignano's car and Savignano and Mr. Peden then left in Savignano's car with an almost full bottle of Jim Beam whiskey in their possession.
>
> On 6/30/83, pursuant to a search warrant, police went to the residence of Mark Savignano in Aptos, CA. At the residence they found a blue Ford parked by the house. Inside the Ford they found various items of evidence. Blood was found on the carpet of the car, both in the front and rear passenger areas. There was also a large amount of blood along the side of the front passenger seat. There was evidence of blood having been wiped away on the seat and along the bottom of the doorframe. The police officers found blood on the front door knob, on the front door and on the floor in Savignano's house. They found a black leather vest stained with blood in Savignano's bedroom. This same vest was seen worn by Savignano by Mr. Souza on the night of 6/27/83. Also found in the house were a pair of blue jeans with red stains, and ace bandage with red stains, and on top of the washing machine, two yellow t-shirts with dark red stains. The items of evidence containing blood samples that were analyzed by the Oakland Crime Laboratory were found to be consistent with the victim's blood.

Suppl. Habeas Rec. Ex. A (Life Prisoner Evaluation Report, Nov. 2005).

In 1985 petitioner pleaded guilty to second degree murder and was sentenced to fifteen years to life in prison. Answer Ex. A (Abstract of Judgment). On June 6, 2006, petitioner, represented by counsel, appeared for his seventh parole suitability hearing before the Board, which denied parole for two years. Answer Ex. B at 85 (Board hearing transcript, June 6, 2006).

Petitioner filed state habeas petitions challenging the Board's decision in the superior court and court of appeal, which denied relief. Answer Exs. F, G. Petitioner filed a

petition for review in the state supreme court, which summarily denied review. Answer Ex. H.

On April 3, 2007, petitioner filed this petition for writ of habeas corpus. On May 11, 2007, the court ordered respondent to show cause why a writ should not be issued. Respondent has filed an answer, and petitioner has filed a traverse. Pursuant to the court's order to supplement the habeas record, respondent filed the November 2005 Board report under objection (docket no. 14). For the reasons set forth in the court's September 4, 2008, order denying respondent's motion for reconsideration, respondent's objection is overruled. The petition is submitted for a decision on the merits.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The

3

federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

Under Section 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340.

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of a state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-806 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000), *cert. denied*, 534 U.S. 944 (2001).  Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a federal court conducts "an independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law.  *See Plascencia v. Alameida*, 467 F.3d 1190, 1198 (9th Cir. 2006); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

## DISCUSSION

As grounds for federal habeas relief, petitioner claims that: (1) the Board denied parole pursuant to a "no parole policy" and denied him due process by failing to give him individualized consideration for parole suitability; and (2) the Board's denial of parole was not supported by some evidence.  Neither of these claims merit habeas relief.  The court first considers the claim that "some evidence" did not support the Board's decision.

**I.   Due Process in Parole Suitability Determinations**

   **A.   Some Evidence Standard of Judicial Review**

The Ninth Circuit has determined that a California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings.  *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (citing *Board of Pardons v. Allen*,

482 U.S. 369 (1987); *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1 (1979)). *See also Irons v. Carey*, 505 F.3d 846, 851 (9th Cir.), *reh'g and reh'g en banc denied*, 506 F.3d 951 (9th Cir. 2007); *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1127-28 (9th Cir. 2006), *reh'g and reh'g en banc denied*, No. 05-16455 (9th Cir. Feb. 13, 2007); *Biggs v. Terhune*, 334 F.3d 910, 915-16 (9th Cir. 2003).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. *Sass*, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985)). *See also Irons*, 505 F.3d at 851. "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board. *Sass*, 461 F.3d at 1128 (quoting *Hill*, 472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" *Id.* at 1129 (quoting *Hill*, 472 U.S. at 457).

Respondent contends that an inmate is entitled to only minimal protections to satisfy due process in a parole proceeding. Citing *Greenholtz*, Respondent contends that due process in state parole procedures is satisfied merely if they afford the inmate an opportunity to be heard and a decision informing him why he did not qualify for parole release. The Ninth Circuit, however, has held that requiring less than the some evidence standard "would violate clearly established federal law because it would mean that a state could interfere with a liberty interest - that in parole - without support or in an otherwise arbitrary manner." *Sass*, 461 F.3d at 1129. Thus, the some evidence standard is clearly established law in the context of parole denial for purposes of federal habeas review. *Ibid.*

In order to determine whether the state court decisions were contrary to, or an unreasonable application of, clearly established federal law, the court looks to the last reasoned state court opinion, which is that of the superior court denying the state habeas

5

1  petition. Answer Ex. F (*In re Savignano*, Case No.78049, slip op. (Super. Ct. Alameda Co.
2  November 3, 2006)). *See Shackleford*, 234 F.3d at 1079 n.2.

### B. Board's Unsuitability Determination

In Claim Two, petitioner contends that his due process rights were violated because the Board's decision was not supported by some evidence. The superior court denied petitioner's claims on the following grounds:

> Petition is denied. The Petition fails to state a prima facie case for relief. Even though Petitioner has submitted numerous documents in support of his Petition, review of the transcripts provided and documents pertaining to the December 6, 2005 [sic] hearing, indicate that there was no abuse of discretion by the Board of Prison Terms. The factual basis of the BPT's decision granting or denying parole is subject to a limited judicial review. A Court may inquire only whether some evidence in the record before the BPT supports the decision to deny parole. The nature of the offense alone can be sufficient to deny parole. (*In Re Rosenkrantz* (2002) 29 Cal 4th 616, 652, 658, 682. The record presented to this Court for review demonstrates that there was certainly some evidence, including, but not limited to the committing offense, Petitioner's need to demonstrate viable employment plans, Petitioner's need to update his parole plans and to remain disciplinary free. There is nothing in the record that indicates that the Board's decision was arbitrary or capricious, nor that Petitioner's equal protection or due process rights were violated. Thus, Petitioner has failed to meet his burden of sufficiently proving or supporting the allegations that serve as the basis for habeas relief.

Answer Ex. F (*In re Savignano*, slip op.) at 1.

### 1. State Regulations Governing Parole Suitability

In assessing whether the Board's denial of parole was supported by some evidence, the court's "analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state." *Irons*, 505 F.3d at 851 (citing *Biggs*, 334 F.3d at 915). "Accordingly, here we must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' in [petitioner's] case constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*, 472 U.S. at 454." *Ibid.* Under California law, "[t]he Board must determine whether a prisoner is presently too dangerous to be

6

deemed suitable for parole based on the 'circumstances tending to show unsuitability' and the 'circumstances tending to show suitability' set forth in Cal. Code. Regs., tit.15 § 2402(c)-(d)." *Ibid.*

Title fifteen, section 2402, of the California Code of Regulations sets forth the criteria for determining whether an inmate is suitable for release on parole. The circumstances tending to show that a prisoner is unsuitable include the following: (1) the commitment offense, where the offense was committed in "an especially heinous, atrocious or cruel manner;" (2) the prisoner's previous record of violence; (3) "a history of unstable or tumultuous relationships with others;" (4) commission of "sadistic sexual offenses;" (5) "a lengthy history of severe mental problems related to the offense;" and (6) "serious misconduct in prison or jail." Cal. Code. Regs., tit. 15 § 2402(c). The circumstances tending to show that a prisoner is suitable for parole include the following: (1) the prisoner has no juvenile record; (2) the prisoner has experienced reasonably stable relationships with others; (3) the prisoner has shown remorse; (4) the prisoner committed his crime as the result of significant stress in his life; (5) the prisoner suffered from Battered Woman Syndrome at the time of committing the crime; (6) the prisoner lacks any significant history of violent crime; (7) the prisoner's present age reduces the risk of recidivism; (8) the prisoner "has made realistic plans for release or has developed marketable skills that can be put to use upon release;" and (9) institutional activities "indicate an enhanced ability to function within the law upon release." Cal. Code. Regs., tit. 15 § 2402(d).

### 2. *Biggs* Challenge

In support of his claim that the Board's decision was not supported by some evidence, petitioner argues that the Board improperly relied on the unchanging circumstances of the commitment offense and his prior history to find him unsuitable for parole. Petitioner relies on *Biggs*, where the Ninth Circuit suggested in dicta that sole reliance on the commitment offense could raise "serious questions" about a state prisoner's liberty interest in parole. *See Biggs*, 334 F.3d at 916-17. *Biggs* upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct

before incarceration, but cautioned that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." *Biggs*, 334 F.3d at 916-17.

As the Ninth Circuit noted in *Sass*, "*Biggs* affirmed a denial of parole after holding that the circumstances of the offense and conduct prior to imprisonment constituted some evidence to support the Parole Board's decision." *Sass*, 461 F.3d at 1126 (citing *Biggs*, 334 F.3d at 917). *See Biggs*, 334 F.3d at 916 ("As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law.").

The Ninth Circuit has expressed competing views on *Biggs* in subsequent panel decisions. In *Sass*, the Ninth Circuit held that evidence of Sass's prior offenses and the gravity of his commitment offenses constituted some evidence to support the Board's decision. 461 F.3d at 1129. Acknowledging the cautionary statements in *Biggs* concerning the potential for a due process violation by continued reliance in the future on immutable factors, *Sass* criticized that part of the opinion as improper speculation about how future parole hearings could proceed. *Ibid.*

In *Irons*, however, the Ninth Circuit echoed the concern raised in *Biggs* and expressed its "hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." *Irons*, 505 F.3d at 854 (citing *Biggs*, 334 F.3d at 917). Although the court determined that the Board's unsuitability finding was supported by "some evidence" that Irons's crime was especially cruel and callous, the *Irons* panel pointed out that in the cases holding that sole reliance on the commitment offense did not

8

violate due process, namely, *Irons*, *Sass* and *Biggs*, "the decision was made before the inmate had served the minimum number of years required by his sentence." *Irons*, 505 F.3d at 852-54. *Irons* reasoned that due process was not violated when these prisoners were deemed unsuitable for parole "prior to the expiration of their minimum terms," even if they had demonstrated substantial evidence of rehabilitation. *Id.* at 854.

Recently, the Ninth Circuit held rehearing en banc in *Hayward v. Marshall*, 512 F.3d 536 (9th Cir.), *reh'g en banc granted*, 527 F.3d 797 (9th Cir. 2008), which presented a state prisoner's due process habeas challenge to the denial of parole. The three-judge *Hayward* panel had concluded that the gravity of the commitment offense had no predictive value regarding the petitioner's suitability for parole, and held that the governor's reversal of parole was not supported by some evidence and resulted in a due process violation. 512 F.3d at 546-47. The Ninth Circuit held rehearing en banc in *Hayward* on June 24, 2008, and has ordered further briefing on the application of the California Supreme Court's decisions in *In re Lawrence*, No. S154018, slip op. (Cal. Aug. 21, 2008) and *In re Shaputis*, No. S155872, slip op. (Cal. Aug. 21, 2008). *See Hayward v. Marshall*, No. 06-55392, slip op. at 1 (9th Cir. Sept. 8, 2008). In *Lawrence* and *Shaputis*, the state supreme court decided issues of state court review of parole decisions as a matter of state law. *See Lawrence*, slip op. at 47 ("the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor"); *Shaputis*, slip op. at 22-24 (concluding that some evidence supported governor's determination that the inmate posed current risk to public safety and was unsuitable for parole). Those decisions are not binding on this court, and the Ninth Circuit has not yet issued an en banc decision in *Hayward*.

Unless or until the en banc court overrules the holdings of the earlier Ninth Circuit panel decisions in *Biggs*, *Sass* and *Irons*, these cases hold that California's parole scheme creates a federally protected liberty interest in parole and therefore a right to due process

9

which is satisfied if some evidence supports the Board's parole suitability decision. *Sass*, 461 F.3d at 1128-29. These cases also hold that the Board may rely on immutable events, such as the nature of the conviction offense and pre-conviction criminality, to find that the prisoner is not currently suitable for parole, *Sass*, 461 F.3d at 1129. *Biggs* and *Irons* further suggest, however, that over time, the commitment offense and pre-conviction behavior become less reliable predictors of danger to society such that repeated denial of parole based solely on immutable events, regardless of the extent of rehabilitation during incarceration, could violate due process at some point after the prisoner serves the minimum term on his sentence. *See Irons*, 505 F.3d at 853-54.

Relying on *Biggs* and *Irons*, petitioner contends that the commitment offense is no longer a reliable predictor of his present and future dangerousness and does not satisfy the "some evidence" standard. Respondent counters that the court may not grant relief on the purported *Biggs* claim because *Biggs* is not clearly established federal law as determined by the Supreme Court. Assuming, without deciding, that under some circumstances, habeas relief may be granted under *Biggs* on a claim that parole denial based on the Board's sole reliance on the commitment offense and other unchanging factors does not satisfy the some evidence standard, the court finds that petitioner fails to establish the predicate for a *Biggs* claim because the Board did not rely solely on the unchanging factors of his commitment offense and juvenile record, but also his lack of realistic parole plans and his disciplinary record, as discussed further below.

### 3. Parole Unsuitability

At the June 6, 2006, hearing, the Board considered several factors favoring petitioner's suitability for parole, including petitioner's institutional behavior: he worked as a teacher's aid and participated in vocational training and self-help activities such as Alcoholics Anonymous for thirteen years, Narcotics Anonymous, creative writing classes, and the "change" program for anger management skills. Answer Ex. B at 27-31. The Board found that petitioner had a generally good disciplinary record of five "128" counseling memos and five "115" serious rules violations during his twenty-three years of

incarceration, with the two most recent violations in 2003 for refusal to work. *Id.* at 32-35, 43. *See also* Answer Ex. D (Disciplinary Sheet). The Board found that petitioner was found not guilty of a "115" violation report issued in 2005 for participating in a work stoppage. Answer Ex. B at 32-33.

Petitioner received a favorable psychological report, dated September 2003, which concluded that petitioner had a good level of insight into the crime, his violence potential was no higher than the average citizen, and his most significant risk factor would be a return to alcohol, which could be a precursor to violence. *Id.* at 76. *See also* Pet. Ex. B at 1-2 (Psychological Evaluation, Sept. 29, 2003). The Board also determined that petitioner showed some remorse and insight into the crime. Answer Ex. B at 71-72.

Having considered factors of suitability, the Board nonetheless concluded that petitioner posed an unreasonable risk of danger to society and a threat to public safety if released from prison based on the following factors of unsuitability: (1) the commitment offense was carried out in an especially cruel, callous and dispassionate manner; (2) petitioner had an unstable social history; (3) inadequate parole plans; and (4) two rules violations for "refusal to work" in his disciplinary record.

### a. Commitment Offense

The regulations provide that the Board may consider the following factors in determining whether the commitment offense was "especially heinous, atrocious or cruel:" (A) multiple victims were attacked, injured or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled or mutilated during or after the offense; (D) the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; (E) the motive for the crime is inexplicable or very trivial in relation to the offense. Cal. Code Regs., tit. 15 § 2402(c)(1).

Petitioner discussed certain details of the crime at the hearing: petitioner was seventeen years old and had recently joined the army, awaiting instructions to be sworn in and start basic training; on the night of the murder, he and the victim were both drunk and

driving home from Souza's house; they started an argument over petitioner turning on the radio; the victim grabbed petitioner by the throat; petitioner panicked and pulled out a knife that he always carried with him; he stabbed the victim to death. Answer Ex. B at 10-13. The counselor's evaluation reflects petitioner's earlier statement that he stabbed the victim because the victim lunged and grabbed at him. Pet. Ex. D at 2 (Life Prisoner Evaluation Report Sept. 2002). Petitioner also stated that when the victim stopped moving, he checked for and could not find a pulse; then he removed the victim from his car and returned home in a state of confusion. *Ibid.*

The records indicate that a witness found the victim's body lying in the street near his ten-speed bicycle. Answer Ex. C at 7 (Probation Officer's Report, Offense History). The victim's hands were found to have defensive-type wounds: his fingertips were sliced, with blood oozing from the wounds. *Ibid.* The victim had six stab wounds to the body. *Id.* at 8. The Board determined that the victim was brutally stabbed numerous times, bore defensive wounds and was left bleeding in the street. Answer Ex. B at 71. The Board also found the motive inexplicable, as petitioner himself acknowledged. *Ibid.*

The record therefore contains some evidence to support the Board's determination that the offense was especially cruel in that it was carried out in a dispassionate manner and demonstrated a callous disregard for human suffering.

### b. Prior History

The Board reviewed petitioner's juvenile record, noting that he was a juvenile at the time of the offense. Answer Ex. B at 13-14. Petitioner was arrested in 1970 for truancy, when he was about the age of five, having been truant from school for nearly three months. *Id.* at 14. From the age of nine, petitioner and his mother acted out violently against each other, and petitioner was taken to the psychiatric ward of Highland Hospital in 1979 and 1980. *Id.* at 14, 16. *See also* Answer Ex. C at 3. In February 1982, petitioner was taken into custody for assaulting his mother and was committed to a boys' ranch. Answer Ex. B at 14. In June 1982, he failed to return to the boys' ranch after a home visit and lived with his mother; he remained at large until October 1982, when his mother complained that he

had torn up her apartment because she would not give him money for drugs. *Ibid.* Petitioner was released to attend his grandfather's funeral, but failed to appear for a judicial hearing on November 9, 1982. *Ibid.* He was arrested on November 24, 1982, and ordered to serve ninety days at juvenile hall. *Ibid.* Petitioner was released to his mother in February 1983, and they moved to his grandfather's house in Aptos. Answer Ex. C at 3. In April 1983, petitioner was placed in juvenile hall for threatening his mother, and was released to her custody after being held for a couple of weeks. Answer Ex. B at 14-15. In June 1983, petitioner was arrested for the commitment offense. *Id.* at 15.

Reviewing petitioner's social history, the Board considered that petitioner was born out of wedlock. His mother's parents initially disowned her as a result of her pregnancy, but relented and lived with petitioner and his mother for many years. *Id.* at 16. Petitioner explained his volatile relationship with his mother as the result of her untreated chemical imbalance, and acknowledged that they do not get along. *Id.* at 15-16. Petitioner's grandfather served as a surrogate father figure, and encouraged petitioner's aggressiveness, giving him a BB gun at age nine or ten. *Id.* at 17. From the age of eleven, petitioner had tacit permission to use a .22, and later a .44 magnum pistol and semi-automatic rifle. *Ibid.* At age thirteen, petitioner began to associate with a biker crowd and started to use marijuana. *Ibid.* He also used LSD, hash, mushrooms, uppers and downers, and some cocaine and alcohol. *Ibid.* Petitioner was constantly truant at his high school and dropped out in 1981 at about age fifteen. *Ibid.*

The deputy district attorney of Alameda County appeared at the hearing to oppose petitioner's parole suitability. She pointed out inconsistencies in prior reports about his family history, noting that his 1999 psychological evaluation reported that "[h]e described his relationship with his mother as generally warm and supportive," which was not true. *Id.* at 50-51, 56-57. *See* Pet. Ex. B at 1 (Psychological Evaluation June 22, 1999).

The record therefore contains some evidence to support the Board's determination that petitioner "had a history of an unstable environment." Answer Ex. B at 72. There is also some evidence to support the Board's finding that petitioner started abusing drugs and

alcohol from a young age, posing a risk of violence should he return to alcohol and/or substance abuse. *Id.* at 76.

### c.  Parole Plans

At the hearing, petitioner discussed his plans to live in Atascadero with the parents of his ex-girlfriend. That couple offered a letter of support and were managing petitioner's money. Answer Ex. B at 20-21, 77-78. The Board was satisfied with his residential plans, but had concerns about his plans for employment. *Id.* at 82-83. Petitioner planned to join the machinist union, but admitted "I might not be able to find a job as a machinist in Atascadero." *Id.* at 21-22. The Board indicated that petitioner should contact the union, get documentation about the union, and inquire into job availability in the central coast area near Atascadero. *Id.* at 82-83.

The record therefore contains some evidence to support the Board's determination that petitioner did not have viable plans for release, and needed to do additional research about union membership and employment.

### d.  Disciplinary Record

The Board considered that petitioner obtained two serious rules violation reports in February and March 2003 for refusal to work. Under questioning by the deputy district attorney, petitioner explained that he lost a job because he was transferred from one wing to another, and was given a cooking job in the kitchen. Answer Ex. B at 43-44. He was not satisfied with the new job, which required him to wake up at 2:30 a.m., and he was not able to sleep during the day. *Id.* at 44. He requested a job transfer, and quit when he could not get another job. *Id.* at 45.

The Board expressed concern that the 2003 rules violations were "needless," and that petitioner would have to learn how to deal with situations such as unsatisfying jobs or disagreements with people. *Id.* at 73. The Board referred to petitioner's refusal to talk to the correctional counselor in advance of the parole hearing to prepare the evaluation report for the Board. Petitioner explained that he did not trust the counselor to be accurate and was concerned that his statements would be misconstrued, but the Board was concerned

that petitioner's refusal to cooperate with people could lead to conflict. *Id.* at 45-46, 73. The record thus contains some evidence to support the Board's determination that petitioner's disciplinary record rendered him unsuitable for parole.

Contrary to petitioner's claim that the Board's decision violated his right to due process, the record contains some evidence to support the Board's parole unsuitability determination. The state courts' denial of habeas relief on this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

## II.    "No Parole Policy" Claim

In Claim One, petitioner contends that his due process rights were violated because the Board denied parole pursuant to a "no parole policy," and did not give him individualized consideration for parole eligibility. The record demonstrates that the Board considered specific facts related to the commitment offense, petitioner's social history and juvenile record, his post-conviction record, progress since his last parole hearing, psychological evaluations, correctional counselor reports, and his parole plans. These particularized findings do not demonstrate an arbitrary and capricious decision to deny parole. Petitioner's due process claim challenging the Board's decision is therefore denied.

## CONCLUSION

Based on the foregoing, the petition for a writ of habeas corpus is DENIED. The clerk of the court shall terminate all pending motions, enter judgment for respondent, and close the file.

**IT IS SO ORDERED.**

Dated:   September 11 , 2008.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.07\Savignano1850.DENY.wpd

15